# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMELIA J. HARRIS,

        *Plaintiff*,

    v.

CNN AMERICA, INC / WARNER MEDIA
INC., *et al.*,

        *Defendants*.

Civil Action No. 23‑3526 (SLS)

Judge Sparkle L. Sooknanan

**REDACTED**

## MEMORANDUM OPINION

Amelia J. Harris worked in various roles for CNN America and Warner Brothers Discovery for over seven years before her termination. She brought this lawsuit under the Pregnant Workers Fairness Act (PWFA), the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), Title VII of the Civil Rights Act of 1964, the D.C. Human Rights Act (DCHRA), the D.C. Protecting Pregnant Workers Fairness Act (PPWFA), and the D.C. Wage Payment and Collection Law (DCWPCL). Ms. Harris alleges that she was terminated after the birth of her child because she sought accommodations related to a medical condition requiring her to scald and freeze her breast milk. The Defendants now move for summary judgment. The Court grants that motion in part and denies it in part. Because Ms. Harris cannot succeed on her PWFA and DCWPCL claims as a matter of law, the Court grants summary judgment for the Defendants on those claims. But this case raises genuine disputes of fact on the ADA, FMLA, Title VII, DCHRA, and PPWFA claims, so the Court denies summary judgment on those claims, which will proceed to trial for resolution by a jury.

## BACKGROUND

### A.    Factual Background

The Court draws the facts from the Statements of Material Facts submitted by the Parties as well as the underlying materials referenced by those statements. *See* Defendants' Statement of Undisputed Material Facts (CNN SUMF), ECF No. 41-2; Plaintiffs' Statement of Disputed Material Facts, ECF No. 42-1, Defendants' Response to Plaintiffs' Statement of Disputed Material Facts (SMF), ECF No. 43-1; Sealed Documents, ECF No. 44.

Ms. Harris joined CNN America and Warner Brothers Discovery in early 2015, SMF ¶ 1, and was promoted to the role of Senior Business Coordinator in 2017, SMF ¶ 3. Her job duties included performing administrative tasks—such as onboarding and offboarding employees, greeting guests and job candidates, setting up catering, handling new vendor management, and approving expense reports and invoices. SMF ¶ 5. During the time period relevant to this lawsuit, Manager Raquel Scott and Director Suzanne Nelson served as Ms. Harris's first- and second-line supervisors, respectively. SMF ¶ 6.

In March 2020, the Defendants moved to full-time telework due to the COVID-19 pandemic. SMF ¶ 7. At the time, Ms. Harris was pregnant, and she gave birth in June 2020. SMF ¶ 8. Ms. Harris took maternity leave, which ended in August 2020, after which she used her "use it or lose it" paid time off until November 2020. SMF ¶ 10. She then returned from leave and resumed working remotely. *Id.* Around that time, Ms. Harris learned that she suffered from high lipase, a medical condition that compromised her lactation function by rapidly breaking down the fats in her breast milk. SMF ¶ 13. As a result, Ms. Harris needed to feed any pumped breast milk to her baby or scald it for storage within approximately one hour. SMF ¶ 14. Milk that was not consumed or scalded within about one hour had to be discarded. *Id.*

As the Defendants started making plans for their employees to return to the office, Ms. Harris submitted a return-to-work release form to the human resources department, which included a note from her treating medical provider stating that Ms. Harris needed a private space and time to pump breast milk. SMF ¶ 9. Ms. Harris requested other accommodations for her condition too, including continued remote work and time to scald her breast milk. SMF ¶ 15. Both Ms. Scott and Ms. Nelson were aware that Ms. Harris had requested an accommodation for her lactation needs. *Id.* Although Ms. Harris was provided with pumping breaks during this time while she worked from home, the Parties dispute whether other employees disregarded Ms. Harris's breastfeeding schedule and contacted her while she was pumping. SMF ¶ 12.

The Defendants first announced a return to office plan in March 2021, with a target return to office date of September 1, 2021. SMF ¶ 16. After postponing the return date several times, CNN announced a final return to office date of March 14, 2022, requiring employees to return to the office a minimum of three days per week, subject to business needs. SMF ¶¶ 16, 20–21.

Before the Defendants finalized a company-wide return-to-office date, Ms. Harris communicated with Ms. Scott regarding her anticipated schedule. SMF ¶ 17. Ms. Harris advised Ms. Scott that she would need time and a private place to pump breast milk for her baby. SMF ¶ 24. Because of her high lipase, Ms. Harris also communicated a need to scald and store her breast milk. *Id.* She requested to use a hot plate to scald her milk at work as a lactation accommodation, SMF ¶ 29, and asked the Defendants to pay for the required materials, SMF ¶ 30. The Defendants granted the accommodation but declined to cover the expenses. *Id.*; SMF ¶ 14. Despite the approval, Ms. Harris claims that the building management did not permit the use of a hot plate. SMF ¶ 32. According to Ms. Harris, if she "brought one in, no one would tattle on [her], but it wouldn't actually be authorized approval, basically pinning the liability and fault on [her] if

anything were to occur." *Id.* Ms. Scott did not provide written approval from the building management but asked Ms. Harris to inform management that she had permission to use the hot plate. SMF ¶ 31.

Prior to the return-to-office date, Ms. Harris asked to continue teleworking until early September 2022. SMF ¶ 33. The Parties dispute whether her request was motivated by uncertainty about having a private place to pump and the equipment she needed to scald the milk and sterilize items, including a hot plate. *Id.* On August 9, 2022, Ms. Harris spoke with the Director of Leave Administration, Jeanette Avedissian, about her request. SMF ¶ 36. During this call, Ms. Avedissian denied Ms. Harris's request and instead proposed a gradual return-to-office schedule. SMF ¶ 37. Under the proposed schedule, Ms. Harris would report to the office at least one day per week for two weeks beginning on August 22, 2022. SMF ¶ 38. Then, starting on September 6, 2022, Ms. Harris would report to the office two times per week for two weeks. *Id.* And on September 19, 2022, Ms. Harris would start reporting to the office at least three days per week. *Id.*

On August 12, 2022, Ms. Harris met with Valerie Jennings from the Human Resources Department and Ms. Avedissian via a Zoom call to further discuss her request and Defendants' proposed return schedule. SMF ¶ 39. They opened the meeting by stating that the company would not allow Ms. Harris to continue working remotely until September 19, 2022, as she had requested. SMF ¶ 40. Ms. Harris explained that, due to her disability and the lack of accommodations, the amount of time she would spend pumping and treating her milk in the office would interfere with her ability to complete her duties. SMF ¶ 41. The Parties dispute whether Ms. Harris alternatively requested taking leave during this call. SMF ¶ 44. Ms. Jennings told Ms. Harris that if Ms. Harris was not able to return to office after her leave of absence, she would have to resign. SMF ¶ 42. And Ms. Avedissian communicated to Ms. Harris that if she could not comply with the schedule,

the company would consider her to have voluntarily resigned. *Id.* Ms. Harris was uncomfortable with Ms. Jennings' actions and tone during this meeting and reported Ms. Jones's behavior to her manager, Ms. Scott. SMF ¶¶ 42–45. Then, later that day, Ms. Scott and Ms. Jennings called Ms. Harris, and Ms. Jennings asked Ms. Harris whether she was going to resign. SMF ¶¶ 46–47.

On August 13, 2022, Ms. Harris's husband suffered a serious injury. SMF ¶ 50. As a result, Ms. Harris requested FMLA leave to care for him for the remainder of August 2022. *Id.* On August 23, 2022, while on FMLA leave, Ms. Harris filed an anonymous internal complaint of discrimination and harassment against Ms. Jennings through the Defendants' system for reporting complaints, EthicsPoint. SMF ¶ 51. On August 24, 2022, the Defendants' People Relations Officer, Lisa Reeder, reached out to Ms. Avedissian regarding an "Anonymous Complaint" that she said "involve[d] some difficulty the employee ha[d] experienced in getting requested accommodations due to a disability." SMF ¶ 53. Although Ms. Reeder stated that the complaint was anonymous, Ms. Avedissian could tell, based on the content of the complaint, that Ms. Harris had filed it. SMF ¶ 54. She wrote to Ms. Reeder: "Confirming I know who this is do you have a moment to chat in Teams or should I schedule a call?" *Id.*

On or around September 1, 2022, Ms. Harris resumed teleworking after her FMLA leave ended. SMF ¶ 55. On September 2, 2022, Ms. Avedissian sent Ms. Harris an email memorializing their earlier determination that she could not telework as an accommodation for her high lipase and that "employers are not required to provide 100% remote work as [a] reasonable accommodation when one or more essential functions of your role cannot be performed remotely." *See* Pl.'s Ex. 27, ECF No. 44-27. On September 8, 2022, Ms. Harris replied to Ms. Avedissian, copying Ms. Jennings, stating that the Defendants did not appear to understand her "particular

situation and how it differs from the basic breastfeeding needs protected by federal and D.C. law."

SMF ¶ 57. Ms. Harris further explained:

> As the medical information I have provided explains, I suffer from a genetic condition that makes it necessary for me to scald my breast milk after expressing it and before refrigerating or freezing it. As a result, if I am out of the house, I would have to spend 30 minutes every two hours pumping milk, 15-20 minutes preparing and scalding the milk in a stainless steel pot to exactly 180 degrees F, then flash cooling it in a stainless steel bottle in an ice bath until it reaches 50 degrees F and can be transferred to a storage bag or container, then 10-15 minutes to clean and then sterilize my equipment (using a steam sterilizer that actually releases steam) and dry everything for another 80 minutes somewhere where my equipment is secure and sanitization is guaranteed, so I need to be able to monitor the equipment to ensure against contamination or tampering….

SMF ¶ 58 (emphasis omitted). Ms. Harris also asked Ms. Avedissian to identify the essential functions the Defendants believed she could only perform in the office, noting that she had performed the essential functions of her position remotely for two years. SMF ¶ 61. As another attempt to resolve the disagreement, Ms. Harris offered to use sick leave or vacation through September 19, 2022, then return to work at least 3 days per week in-office. SMF ¶ 62. Ms. Jennings forwarded the email with this request to her supervisors Katie Parivechio and Jeanelle Beach, as well as the Defendants' general counsel. SMF ¶ 63.

Around this time, the Defendants assigned Ms. Parivechio to be Ms. Harris's new human resources contact because of the open complaint against Ms. Jennings. SMF ¶ 65. And Ms. Scott understood that she could not communicate with Ms. Jennings about Ms. Harris. SMF ¶ 66.

On September 13, 2022, Ms. Scott informed Ms. Harris that beginning the week of September 19, 2022, Ms. Harris was required to work eight hours a day in the office on the days she reported to the office. SMF ¶ 70. Later that day, Ms. Scott sent Ms. Harris a follow-up email regarding their meeting, copying Ms. Parivechio. SMF ¶ 71. In the email, Ms. Scott reiterated: "You are required to work 8 hours a day when you are in office; standard hours of operation, i.e., 8am-6pm…." *Id.* She also provided a link and text from Defendants' "Flexible Time Off (FTO)

Policy." *Id.* But the policy referenced in the email made no mention of a policy concerning an eight hour in office requirement. SMF ¶ 72.

Ms. Harris requested confirmation about the applicability of the FTO policy because it applied only to salaried workers and Ms. Harris was an hourly worker. SMF ¶ 73. Ms. Parivechio forwarded Ms. Harris's request to Ms. Jennings and the Defendants' general counsel. SMF ¶ 74. In response, Ms. Scott stated: "While our team does not have specific written policies about scheduling or finding coverage, all team members are expected to work 8 hours in the bureau on the days that they come in, and, as we discussed, I must be notified in advance for any days team members switch with others. These guidelines apply to our entire team." SMF ¶¶ 76, 91. Ms. Harris replied: "[G]iven [the] remark that we don't have written policies concerning schedule and coverage, I want to be sure that there are no unwritten policies regarding schedule and coverage with which I am being expected to comply with." SMF ¶ 77. In October 2022, Ms. Harris contacted Ms. Reeder and requested to add Ms. Scott to her internal complaint. SMF ¶ 92.

On September 19, 2022, Ms. Harris returned to the office three days per week. SMF ¶ 82. Upon returning to the office, Ms. Harris was given access to a "Quiet Room"—a private room where she could pump that was informally known as the "lactation room." SMF ¶ 25. But because any employee could reserve and use the room by making a calendar appointment, *id.*, Ms. Harris had concerns about the availability of the Quiet Room when she needed it. SMF ¶¶ 26–29. She expressed those concerns to Ms. Scott. *Id.* The Parties dispute whether the Quiet Room was available at Ms. Harris's lactation times. *See id.*

On September 22, 2022, Ms. Harris requested approval to leave the office at 2:30 p.m. to pump her breast milk at home because the Quiet Room was reserved at the time she needed it. SMF ¶ 83. Ms. Scott responded that a "shower room" in the office or in the office gym was

available as an "option" as well. Pl.'s Ex. 34, ECF No. 44-34. Ms. Harris replied: "Lactation expression private spaces may not be located in bathrooms. But thank you for recommending something else." *Id.* On September 23, 2022, Ms. Parivechio responded to Ms. Harris, writing, "I will also look into the Mother's room situation in the DC office." SMF ¶ 89.

On October 22, 2022, Ms. Harris suffered a serious head injury that resulted in a concussion with a significant facial wound. SMF ¶ 93. The day after, she informed Ms. Scott that she would be unable to drive because of the injury. SMF ¶ 94. At the direction of Ms. Jennings, Ms. Scott asked Ms. Harris to "provide a doctor's note." SMF ¶¶ 95, 97. According to Ms. Harris, the Defendants had never previously required her to provide a doctor's note to substantiate her need for either sick time or the ability to telework. SMF ¶ 96.

On October 25, 2022, Ms. Harris saw her primary care physician about her head injury. SMF ¶ 99. Ms. Harris could not get an appointment with a concussion specialist and, therefore, received a note excusing her absence only until November 7, 2022. SMF ¶ 102. Ms. Harris testified that "if [she] tried to take the sick time without providing the note, [she] felt like [the Defendants] were going to fire [her]," and so she continued reporting to the office. SMF ¶ 105. On November 1, 2022, Ms. Harris emailed Ms. Scott to ask whether doctor's notes were required across the office and said that she felt that she was "being singled out and asked to follow different unwritten policies or rules when others on our team are not[.]" SMF ¶ 103. Although she knew she was no longer permitted to discuss Ms. Harris with Ms. Jennings, Ms. Scott forwarded Ms. Harris's email to Ms. Jennings, stating: "Just making sure you aware that Amelia is challenging the doctor's note requirement. She sent the below emails and cried on the phone for over 30 minutes today. I ended the call since we were going in circles." SMF ¶ 104; Pl.'s Ex. 41, ECF No. 44-41. On November

3, 2022, before her appointment with the concussion specialist, Ms. Harris fell at work while walking up a flight of stairs. SMF ¶ 106.

On November 10, 2022, Ms. Reeder notified Ms. Harris that she had completed her review of Ms. Harris's complaints. SMF ¶ 107. Ms. Reeder determined that the complaint against Ms. Jennings was unsubstantiated. SMF ¶¶ 107 And the Parties dispute whether Ms. Reeder investigated the complaints against Ms. Scott or simply dismissed them. SMF ¶ 109. Ms. Scott could not recall ever being interviewed about the complaint. *Id.* The Defendants did not provide Ms. Harris with an investigation report or written notice of the investigation findings. SMF ¶ 108.

In November 2022, the Defendants' then-Vice President of News, Operations and Affiliates, Paul Crum, was tasked with conducting a "restructuring" or "re-organization" that would result in employee layoffs. SMF ¶ 110. Mr. Crum instructed Ms. Jennings to implement the restructuring in the Business Administration section where Ms. Harris was employed. SMF ¶ 111. And Ms. Jennings worked alongside Ms. Nelson to accomplish this reduction in force. Pl.'s Ex. 43, at 35:17–22–36:01–07, ECF No. 44-43. Ms. Jennings emailed Ms. Nelson a blank ███████ ██████████████ spreadsheet to assess employees in three areas: ███████████████ ███████████████████████████████████████ SMF ¶ 114. Some record evidence suggests that Ms. Jennings and Ms. Nelson only reviewed two positions for elimination within the Business Administration section using this matrix: Talent Executive Assistants and Senior Business Coordinators. SMF ¶¶ 113, 116. Ms. Jennings explained that Ms. Nelson should complete a "separate assessment sheet" for each position title and identify "key domain skills which are critical for the role and rate each individual expertise." SMF ¶ 115.

Ms. Nelson rated Ms. Harris lower on the matrix than the other Senior Business Coordinator, ███████████. SMF ¶ 121. The Defendants decided to terminate Ms. Harris based

on Ms. Nelson's assessment. SMF ¶ 128. They notified Ms. Harris of her termination on December 1, 2022. SMF ¶ 131. Beginning on December 18, 2022, Ms. Harris was transferred to FMLA leave and began receiving short-term disability as a result of her head injury. SMF ¶ 135. Ms. Harris was terminated on February 4, 2023. SMF ¶ 131.

### B.    Procedural Background

Ms. Harris filed this lawsuit on November 27, 2023. *See* Compl., ECF No. 1. She later filed an Amended Complaint. *See* Am. Compl., ECF No. 14. The operative Amended Complaint alleges violations of the PWFA, ADA, FMLA, Title VII, DCHRA, PPWFA, and DCWPCL. Following discovery, the Defendants moved for summary judgment on all claims. Mot., ECF Nos. 29, 41. This motion is fully briefed and ripe for review. *See* Opp'n, ECF Nos. 33, 42; Reply, ECF Nos. 40, 43.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006) (citations omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## DISCUSSION

The Defendants seek dismissal of the Amended Complaint in its entirety under Federal Rule of Civil Procedure 56. On Ms. Harris's PWFA and DCWPCL claims, the Court agrees that the Defendants are entitled to judgment as a matter of law. But on the ADA, FMLA, Title VII, DCHRA, and PPWFA claims, the Defendants fail to meet their burden to show an absence of any

genuine disputes of material fact, precluding summary judgment. So the Defendants' motion for summary judgment is granted in part and denied in part.

### A.    PWFA

The Defendants seek summary judgment on Ms. Harris's PWFA claim because that statute went into effect in June 2023—after Ms. Harris's termination. Mot. 31; Consolidated Appropriations Act of 2025, Pub. L. 117-328 (II), § 109, 136 Stat 4459 (December 29, 2022), *codified at* 42 U.S.C. § 2000gg note. Ms. Harris does not dispute this contention in her Opposition. Opp'n 35–36. The Court thus grants summary judgment on the PWFA claim.

### B.    Reasonable Accommodation under the ADA, DCHRA, and PPWFA

Next, the Court addresses Ms. Harris's failure to accommodate claims under the ADA, DCHRA, and PPWFA. Am. Compl. 9–10. The Defendants seek summary judgment on these claims, too. Mot. 18–21. But because they turn on genuine and material factual issues, the Court may not grant judgment as a matter of law.[1]

The ADA mandates that employers make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]" 42 U.S.C. § 12112(b)(5)(A). "The standards applicable to claims brought under the ADA also apply to [] DCHRA claims." *Pressley v. Mgmt. Support Tech., Inc.*, No. 22-cv-2262, 2023 WL 5206107, at *5 (D.D.C. Aug. 14, 2023); *see also Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 153 (D.D.C. 2013) ("In analyzing the sufficiency of [the plaintiffs'] DCHRA claims, the Court will apply the standards applicable to claims brought under the ADA.").

---

[1] To the extent the Defendants' motion could be construed as requesting summary judgment on a standalone discrimination claim, *see* Mot. 13–14, the Court reads the Plaintiff's Amended Complaint and briefing as only alleging failure to accommodate and retaliation claims, *see* Am. Compl. ¶¶ 9–11; Opp'n 35–36. Accordingly, the Court addresses those claims alone—which are the only ones brought in this action.

The PPWFA requires employers to provide a reasonable accommodation "for an employee whose ability to perform the functions of the employee's job are affected by pregnancy, childbirth, a related medical condition, or breastfeeding." D.C. Code §§ 32-1231.01, 32-1231.03. The statute also clarifies that a "reasonable accommodation" includes "[p]roviding private non-bathroom space for expressing breastmilk." D.C. Code § 32-1231.01(G). Similarly, the DCHRA provides that: "An employer shall make reasonable efforts to provide a sanitary room or other location in close proximity to the work area, other than a bathroom or toilet stall, where an employee can express her breast milk in privacy and security." D.C. Code § 2-1402.82(d)(2).

The DCHRA also provides that "[a]n employer shall provide reasonable daily unpaid break periods, as required by the employee, so that the employee may express breast milk for her child to maintain milk supply and comfort." D.C. Code § 2-1402.82(d)(1). And the PPWFA notes that a "reasonable accommodation" for breastfeeding includes "more frequent or longer breaks." D.C. Code § 32-1231.01(2)(A).

### 1.    Relevant Statutes

The Parties dispute whether Ms. Harris has a disability such that her ADA and DCHRA disability accommodation claims are cognizable. Mot. 22–24; Opp'n 11. A disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). A plaintiff has a disability under these statutes if (1) she has a physical or mental impairment (2) that substantially limits (3) a major life activity. *Border v. Nat'l Real Est. Advisors*, 453 F. Supp. 3d 249, 256 (D.D.C. 2020) (citing *Haynes v. Williams*, 392 F.3d 478, 481–82 (D.C. Cir. 2004)). The term disability must be "construed in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A).

Some courts have held that "pregnancy itself is generally not considered a disability" under the ADA. *Border*, 453 F. Supp. 3d at 256 (cleaned up). But it is well established that "a pregnancy that results in a[] [later] impairment that substantially limits a major life activity can be considered a disability." *Id.* (citing *Webster v. Dep't of Educ.*, 267 F. Supp. 3d 246, 267 (D.D.C. 2017)); *see also McKellips v. Franciscan Health Sys.*, No. 13-cv-5096, 2013 WL 1991103, at *4 (W.D. Wash. May 13, 2013) (collecting cases) (pelvic inflammation after pregnancy may be disability). Here, Ms. Harris suffers from high lipase—a condition that compromises her lactation function by rapidly breaking down the fats in her breast milk. SMF ¶ 13. And the Court is convinced that lactation is "a medical condition related to pregnancy." *Mercado v. Sugarhouse HSP Gaming, L.P.*, No. 18-cv-3641, 2019 WL 3318355, at *5 (E.D. Pa. July 23, 2019) (cleaned up). Indeed, Ms. Harris's high lipase is a medical condition that reflects a "departure from a normal pregnancy," and conditions arising from an abnormal pregnancy usually support "a finding of disability under the ADA." *McKellips*, 2013 WL 1991103, at *4. At a minimum, Ms. Harris has demonstrated a pregnancy-related "impairment" under the first prong of the test. *Border*, 453 F. Supp. 3d at 256 (cleaned up). Whether that impairment substantially limits a major life activity under the remaining two prongs is then "a triable issue of fact" and cannot be resolved at summary judgment. *Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913, 921 (N.D. Ill. 2013); *see also Goodman v. Potter*, 412 F. Supp. 2d 11, 15–16 (D.D.C. 2005) ("A determination of disability is analyzed on a case-by-case basis" and can "create[] a genuine issue of material fact[.]")

Turning to Ms. Harris's lactation accommodation claims, the PPWFA and DCHRA provisions providing a cause of action when an employer fails to provide reasonable lactation accommodations are undoubtedly applicable here. *Allen-Brown v. District of Columbia*, 174 F.

Supp. 3d 463, 485 (D.D.C. 2016). Ms. Harris alleges that the Defendants did not provide adequate space or breaks for her lactation needs, in violation of those statutes. Opp'n 7–8.

### 2.    Reasonableness of Accommodations

Having determined that Ms. Harris can bring a claim under the ADA, PPWFA, and DCHRA, the Court must now assess the reasonableness of the accommodations that Ms. Harris requested and received.

An accommodation is reasonable if it "allow[s] an employee to perform the essential functions of the job, without imposing undue hardship on the employer." *Saunders v. Galliher & Huguely Associates, Inc.*, 741 F. Supp. 2d 245, 249 (D.D.C. 2010) (citing *Chinchillo v. Powell*, 236 F. Supp.2d 18, 23 (D.D.C. 2003)). The Defendants contend "that Ms. Harris was able to perform the essential functions of her job as a Sr. Business Coordinator without a reasonable accommodation." Mot. 25. They also claim that "Ms. Harris was granted a reasonable accommodation for breastfeeding needs because she had access to the Quiet Room and the approved use of a hot plate in the office to scald her breastmilk." Mot. 26. But "the question of what constitutes an essential function of a job is [generally] a factual issue to be determined by a jury." *Hancock v. Washington Hosp. Ctr.*, 13 F. Supp. 3d 1, 5 (D.D.C. 2014) (citing *Baker v. Potter*, 294 F. Supp. 2d 33, 44 (D.D.C. 2003)). And "whether an accommodation is reasonable is often a fact-intensive question determined by a close examination of the particular circumstances." *Ali v. Regan*, 111 F.4th 1264, 1269 (D.C. Cir. 2024) (cleaned up). Such questions usually "must be resolved by a factfinder" at trial and are "ill-suited for summary judgment." *Id.* at 1277–78 (cleaned up). Here, various factual disputes about the reasonableness of the accommodations Ms. Harris requested and received make summary judgment inappropriate.

### a. Quiet Room

First, the Parties dispute whether the Quiet Room was a reasonable and effective accommodation under the relevant statutes. *See* Opp'n 7–8; Reply 6. "[O]ne of the requirements for a reasonable accommodation is that it [is] effective." *Cogdell v. Murphy*, No. 19-cv-2462, 2020 WL 6822683, at *6 (D.D.C. Nov. 20, 2020). This is because "[a]n *ineffective* modification or adjustment will not *accommodate* a disabled individual's limitations." *U.S. Airways. v. Barnett*, 535 U.S. 391, 400 (2002) (cleaned up) (emphasis in original). But "[w]hether a provided accommodation is effective or reasonable depends on the facts and circumstances of each case." *Stewart v. USDA*, No. 23-cv-1194, 2024 WL 4332618, at *3 (D.D.C. Sept. 27, 2024) (quoting *Di Lella v. Univ. of D.C. David A. Clarke Sch. of L.*, 570 F. Supp. 2d 1, 8 (D.D.C. 2008)). Here, there are genuine disputes about the effectiveness of the Quiet Room.

For instance, the Parties dispute whether the Quiet Room was booked or otherwise unavailable at the times Ms. Harris needed it to pump. SMF ¶¶ 26–28. Indeed, Ms. Harris contemporaneously complained to Ms. Scott that the Quiet Room's availability did not meet her pumping schedule. SMF ¶¶ 27–28. The Parties also dispute whether Ms. Harris needed to pump on the schedule she communicated. SMF ¶ 28. On September 22, 2022, Ms. Harris requested approval to leave the office at 2:30 p.m. to get home to pump because the Quiet Room was reserved at that time, but the Defendants contest whether she actually needed to pump then. SMF ¶ 83.

Undoubtedly, the Quiet Room was an ineffective accommodation if it was unavailable at the times Ms. Harris needed it to pump. And Ms. Harris's contemporary complaints about availability support the statements in her declaration that she could not access the Quiet Room at required times. *See LeBlanc v. United States Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 17 (D.D.C. 2025) (a declaration can be the basis of a genuine dispute if it has some support in the

record). So any further "[c]redibility determinations, . . . weighing of the evidence, and . . . drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp.* 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).

Putting aside the availability of the Quiet Room, Ms. Harris disputes that the Quiet Room had the necessary resources to be a reasonable accommodation. Opp'n 7. She claims that the Quiet Room was an inadequate accommodation because it was multipurpose and not used solely for lactating mothers. *Id.* This, too, is a jury question. *See Ali*, 111 F.4th at 1269.

### b.  Shower Rooms

Next, the Parties dispute whether the Defendants' shower rooms served as a reasonable accommodation. *See* Opp'n 8; Reply 6. The record demonstrates that two shower rooms were made available to Ms. Harris for pumping once she returned to the office. Pl.'s Ex. 34, ECF No. 44-34. One shower room contained a shower, sink, counter, electrical outlets, and seating, but did not have a toilet. CNN SUMF ¶¶ 64, 65. And that shower room was accessible to anyone in the office, so it was available to Ms. Harris for pumping only when unoccupied. *Id.* ¶ 67. Another shower room was in the office's gym. Pl.'s Ex. 34, ECF No. 44-34. The record does not reveal what was in this shower room. *See id.*

Ms. Harris argues that a shower room is an inadequate accommodation under D.C. law because it is not "a non-bathroom space for expressing breastmilk" under D.C. Code § 32-1231.01. Opp'n 8. Meanwhile, the Defendants argue that the shower room is a non-bathroom space because it does not have a toilet. Reply 6. But that is not dispositive of Ms. Harris's claims. Neither the DCHRA nor PPWFA require an employer to provide a non-bathroom space in every circumstance. Under both the DCHRA and PPWFA, a bathroom could be a "reasonable" accommodation if an

employer could demonstrate supplying an alternative lactation space would impose "undue hardship." *Allen-Brown*, 174 F. Supp. 3d at 484 (quoting D.C. Code § 2–1402.82(a)); D.C. Code § 32-1231.03(1). And whether an accommodation causes "undue hardship," like whether an accommodation is reasonable, is a question for a jury. *Allen-Brown*, 174 F. Supp. 3d at 485. So whether the Quiet Room is a reasonable accommodation either under D.C. law or the ADA is also unsuitable for summary judgment. *See Ali*, 111 F.4th at 1277–78.

### c. Adequate Breaks

Next up is the claim that Ms. Harris did not receive adequate breaks to pump. Ms. Harris points to instances when co-workers contacted her during her scheduled pumping times. SMF ¶¶ 12, 85. But the Defendants dispute the times Ms. Harris needed to pump, *see, e.g.* SMF ¶ 28, and stress the fact that such communications occurred before Ms. Harris's return to the office on September 19, 2022, SMF ¶ 85. These disputes, which go to the "reasonableness" of the pumping break accommodations, also must be resolved by a "factfinder" and are "ill-suited for summary judgment." *Ali*, 111 F.4th at 1277–78.

### d. Teleworking

Finally, Ms. Harris claims that she was denied a reasonable accommodation because the Defendants refused her request to telework when it would take her longer to scald her breast milk and sanitize/transport her equipment at the office. Opp'n 9–14. The Defendants argue that they satisfied their statutory obligations because they provided Ms. Harris a place to pump and scald her milk. Mot. 25–26. And it is true that "[a]n employer fully satisfies its statutory obligation by offering an accommodation that is reasonable, even if it is not the one preferred by the employee." *Ali*, 111 F.4th at 1269. But unless the "undisputed evidence establishes that a proffered accommodation is so plainly effective as to permit summary judgment," the reasonableness of

such alternative accommodations is a question for a jury. *Id.* at 1278. This is especially true under the ADA because "the same accommodation might be appropriate for one disability and inappropriate for another, or appropriate for one employee or one workplace and not for another." *Id.* (cleaned up).

There is also a genuine dispute about whether Ms. Harris's proposed request to telework would be reasonable, would permit her to perform her essential functions, and would not cause undue hardship. *Id.* at 1280 (considering these factors when determining whether an accommodation is reasonable). And the D.C. Circuit has held that "[t]echnological advances and the evolving nature of the workplace" mean that "[p]hysical presence at or by a specific time is not, as a matter of law, an essential function of all employment." *Solomon v. Vilsack*, 763 F.3d 1, 10 (D.C. Cir. 2014) (cleaned up). So whether a teleworking accommodation is reasonable is a "penetrating factual analysis" that should usually be conducted by a jury. *Id.* (cleaned up). Here, Ms. Harris had previously worked remotely for the Defendants before the implementation of the return-to-work policy, and a jury could infer that she could continue her essential functions afterwards. There is therefore enough evidence in the record that Ms. Harris was *not* provided a reasonable accommodation to make summary judgment improper. *See id.*

### C. FMLA

Next, Ms. Harris alleges that the Defendants improperly denied her FMLA leave and/or discouraged her from using FMLA leave in August and September of 2022. Opp'n 33. The Defendants argue that the FMLA is inapplicable here because Ms. Harris lacks a "serious health condition" under that statute. Reply 21.[2] Because a jury could reasonably conclude that

---

[2] The Court rejects the Defendants' suggestion that the Plaintiff's inarticulate deposition responses constituted legal waiver of a claim pleaded in her Amended Complaint. *See* Reply 20.

Ms. Harris's high lipase condition is a serious medical condition triggering FMLA coverage, summary judgment is inappropriate.

The FMLA entitles an employee to leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). To be entitled to FMLA leave, an employee need not mention FMLA and must only provide the employer sufficient information to determine that she has a qualifying serious health condition. *See Omene v. Accenture Fed. Servs.*, No. 18-cv-02414, 2020 WL 1189298, at *4 (D.D.C. Mar. 12, 2020); *Coulibaly v. Tillerson*, 273 F. Supp. 3d 16, 29 n. 20 (D.D.C. 2017). A "serious health condition" is one that involves: "(1) inpatient care in a hospital; (2) inpatient care in a hospice; (3) inpatient care in a residential medical care facility; or (4) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Congress intended such conditions to include "ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth." H.R. Rep. No. 103–8 (1993), reprinted in 1993 U.S.C.C.A.N. at 3, 31; *see also* S. Rep. No. 103–3 (1993), reprinted in 1993 U.S.C.C.A.N. at 30–31 (same).

A pregnancy-related condition is a "serious health condition" under FMLA "based on continuing treatment by a health care professional" when the condition produces "a period of incapacity." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 95 (1st Cir. 2001); *see also Whitaker v. Bosch Braking Sys. Div. of Robert Bosch Corp.*, 180 F. Supp. 2d 922, 928 (W.D. Mich. 2001). When an employee demonstrates that her pregnancy-related condition makes her "unable to perform the functions of the position," it is a "serious health condition" under the FMLA even if the employee "does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three days." *Pendarvis v. Xerox Corp.*, 3 F. Supp. 2d 53, 55 (D.D.C. 1998)

(finding that morning sickness is a pregnancy-related condition that entitles an employee to FMLA leave).

As discussed earlier, *see supra* Discussion B.1, lactation is generally understood as "a medical condition related to pregnancy." *Mercado*, 2019 WL 3318355, at *5 (cleaned up). And the Parties dispute whether Ms. Harris's high lipase was so "serious" or "severe" that she was "unable to perform the functions of [her] position" in the office with the accommodations the Defendants provided. *Pendarvis*, 3 F. Supp. 2d at 56. This question is best left "to a jury's determination." *Id.* Further Ms. Harris's medical condition did not reflect "a normal pregnancy," so a reasonable jury could infer that she may have been "unable to perform her job duties" due to the unique limitations presented by her high lipase. *Whitaker*, 180 F. Supp. 2d at 929. And assuming a jury found that Ms. Harris experienced a serious medical condition under this test, there are two additional questions of material fact that defeat summary judgment.

*First*, the record is unclear whether Ms. Jennings asked Ms. Harris to resign rather than take leave for her high lipase condition during their August 12, 2022, phone call. SMF ¶ 44. The Defendants do not view this as a factual dispute—asking the Court to disregard Ms. Harris's testimony as self-serving. *Id.* But "statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of" summary judgment unless they are "conclusory . . . lacking any factual basis in the record." *LeBlanc*, 784 F. Supp. 3d at 18 (cleaned up). Here, there is record support for Ms. Harris's contentions. It is undisputed that Ms. Jennings and Ms. Avedissian communicated to Ms. Harris that if she could not comply with the return-to-office schedule, the Defendants would consider her to have voluntarily resigned. SMF ¶¶ 42–43. It is also undisputed that Ms. Jennings called Ms. Harris later that day and asked if she was going to resign. SMF ¶ 47. Indeed, Ms. Nelson believed that Ms. Harris had interpreted this conversation

as requiring her to resign. Pl.'s Ex. 54, ECF No. 44-54. And Ms. Harris's contemporary complaints say that Ms. Jennings had told her she should resign during this call. Pl.'s Ex. 23, ECF No. 44-23. This evidence is certainly enough to raise "a genuine issue" for trial that Ms. Harris may have been told that she would have to resign rather than take leave. *LeBlanc*, 784 F. Supp. 3d at 17  (cleaned up).

*Second,* the Parties dispute whether the Defendants' failure to grant Ms. Harris's requests for sick leave or vacation through September 19, 2022, *see* SMF ¶ 62, would likely "'interfere with, restrain, or deny' the 'exercise of or attempt to exercise'" FMLA leave. *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 165 (D.C. Cir. 2015) (characterizing 29 U.S.C. § 2615(a)). If a jury finds that Ms. Harris had a medical condition serious enough to trigger the FMLA, it could also reasonably find that threats that she must resign if she used leave or refusal to respond to leave requests constituted unlawful denial or interference of "an FMLA right." *Id.* Accordingly, the Court denies summary judgment on the FMLA leave denial and interference claims.

### D.    Retaliation

Ms. Harris also alleges retaliation under the ADA, DCHRA, PPWFA, FMLA, and Title VII. She argues that the Defendants impermissibly terminated her because of her requests for accommodations and leave. Opp'n 17–27, 35–36. Here, too, there are issues of fact that preclude summary judgment.[3]

As discussed above, Ms. Harris may proceed under the ADA, DCHRA, PPWFA, and FMLA. She may also proceed under Title VII. The Pregnancy Discrimination Act (PDA) amended Title VII to provide that discrimination "'because of sex' or 'on the basis of sex' include[s], but

---

[3] In the alternative, Ms. Harris argues that she faced a pattern of other retaliatory conduct. Opp'n 28–29. Since the Court permits her termination claim to go to a jury, it need not address this argument.

[is] not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). And "lactation is a normal aspect of female physiology that is initiated by pregnancy and concludes sometime thereafter, and thus is a medical condition related to pregnancy" under this provision. *Mercado*, 2019 WL 3318355, at *5 (cleaned up). Courts have recognized that lactation discrimination and retaliation claims are thus cognizable under Title VII. *See Allen-Brown*, 174 F. Supp. 3d at 478, 483–84, & n.9; *Belov v. World Wildlife Fund, Inc.*, No. 21-cv-1529, 2021 WL 4773236, at *2 (D.D.C. Oct. 13, 2021).

Retaliation claims under the ADA, DCHRA, PPWFA, FMLA, and Title VII are all examined using the burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*. 411 U.S. 792, 802 (1973) (Title VII); *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5-6 (D.C. Cir. 2015) (ADA); *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010) (DCHRA); *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1375 (D.C. Cir. 2020) (FMLA); *Bano v. Bright Horizons IMF*, No. 20-cv-0064, 2020 WL 5518229, at *8 (D.D.C. Sept. 14, 2020) (PPWFA). Under the *McDonnell-Douglas* framework, "an employee must first make out a prima facie case of retaliation or discrimination." *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (citations omitted). "The employer must then come forward with a legitimate, nondiscriminatory or non-retaliatory reason for the challenged action." *Id.* After the employer asserts a legitimate, nondiscriminatory reason for the action, "the district court need not—and *should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Off. of Sergeant of Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, a court must determine whether the employee has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the

actual reason and that the employer intentionally discriminated against the employee"—in other words, that the preferred reason is pretextual. *Id.*

Here, the Defendants proffer a legitimate, non-discriminatory reason for Ms. Harris's termination—that "the decision . . . was based solely on Ms. Nelson's evaluation of the Sr. Business Coordinator position and her assessment of Ms. Harris's performance." Reply 12–13. The question, then, is whether Ms. Harris has presented enough in the record for a jury to conclude that this reason is pretextual. The Court determines that she has.

A plaintiff may establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Francis v. District of Columbia*, 731 F. Supp. 2d 56, 71 (D.D.C. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Summary judgment is improper "if there is evidence from which a reasonable jury could find that the employer's stated reason for the [action] is pretext and any other evidence that unlawful discrimination was at work." *Barnett v. PA Consulting Grp.*, 715 F.3d 354, 358 (D.C. Cir. 2013). Here, the record provides plenty of evidence from which a reasonable jury could infer pretext. *Id.*

*First*, Ms. Nelson wrote to a colleague on August 12, 2022, that Ms. Harris "was a great employee and raised the bar. But this time has been difficult for her and the compassion and flexibility we showed her was not appreciated." Pl.'s Ex. 54, ECF No. 44-54. This discussion happened right after Human Resources told Ms. Harris that if she would not return to the office, the Defendants would consider her "to have voluntarily resigned." SMF ¶ 42. Indeed, Ms. Nelson seemingly suggested that resignation would be "for the best." Pl.'s Ex. 54, ECF No. 44-54. It was only two months later that Ms. Nelson conducted the performance review that determined that Ms. Harris was instead a deficient performer to be terminated. These "inconsistent" statements

about Ms. Harris's performance, *Giles*, 794 F.3d at 8 (citation omitted), could be enough for a reasonable jury to "infer[] that [Ms. Nelson's] stated reason for" Ms. Harris's termination was pretextual, *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015). This is especially true considering the close "temporal proximity" between Ms. Nelson's statements referring to Ms. Harris as a great employee and the negative performance review. *Id.*; *see also Jackson v. Genesee Cty. Rd. Comm'n*, 999 F.3d 333, 352 (6th Cir. 2021) (reversing grant of summary judgment where decisionmaker said employee was "doing a great job" weeks before termination).

*Second*, the record contains some evidence that Ms. Nelson was skeptical of Ms. Harris's leave requests. *See* Ex. 55, ECF No. 44-55 ("[Ms. Harris] just informed me at 410p that she is wfh today and back from leave. Interesting timing[.]"); *id.* ("She said she's been working all day. But last night the leaves people told me she was extending her time: this is bs[.]"). The Parties dispute the best way to interpret these statements. *See, e.g.*, Reply 18. But the Court, at this stage, must "draw all reasonable inferences in [Ms. Harris's] favor." *Ali*, 111 F.4th at 1273. And "evidence of discriminatory statements or attitudes on the part of the employer may support" an inference of pretext, *Czekalski v. Peters*, 475 F.3d 360, 368 (D.C. Cir. 2007) (cleaned up), particularly when such statements "reveal animus against the employee for exercising a protected right," *Lim v. Trs. of Indiana Univ.*, 2001 WL 1912634, at *13 (S.D. Ind. Dec. 4, 2001) (citing *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)), *aff'd*, 297 F.3d 575 (7th Cir. 2002). Thus, any further "weighing of th[is] evidence" must be left to a jury, making summary judgment inappropriate at this time. *LeBlanc*, 784 F. Supp. 3d at 17 (cleaned up).

*Third*, Ms. Harris takes issue with Ms. Nelson's credibility based on inconsistencies in her testimony about whether she knew about Ms. Harris's protected activity. Opp'n 24. At her deposition, Ms. Nelson claimed that she did not know whether Ms. Harris had filed any internal

complaints alleging harassment or discrimination. Ex. 2, at 81:18–21, ECF No. 44-2. But internal emails suggest otherwise. Ex. 53, ECF No. 44-53. Undoubtedly, evidence that an employer is "lying about the underlying facts of its decision" may show pretext. *Allen*, 795 F.3d at 40 (cleaned up). But again, such "[c]redibility determinations" are left to a jury. *LeBlanc*, 784 F. Supp. 3d at 17 (cleaned up).

*Fourth*, Ms. Harris's selection for termination relied on various subjective criteria and decisions that a reasonable jury could infer may be used to "manipulate the selection process." *Moore v. Hayden*, No. 18-cv-2590, 2021 WL 11629829, at *19 (D.D.C. Feb. 22, 2021). The Parties do not dispute that some of the criteria used in the termination matrix were subjective. Opp'n 21; Reply 22. And importantly, Ms. Harris was compared to only one other candidate because Ms. Jennings singled out the Senior Business Administrator role for reduction. *See* SMF ¶¶ 113, 116. A reasonable jury could consider these "subjective factors" as efforts "to camouflage discrimination." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (citation omitted). "[A]lthough employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective considerations with caution." *Id.* Here, because the evidence of subjective decision making is accompanied by other record evidence that supports Ms. Harris's claims, summary judgment on pretext is particularly inappropriate. *See Markowicz v. Nielsen*, 316 F. Supp. 3d 178, 199 (D.D.C. 2018).

*Fifth*, the record shows that the Defendants previously asked Ms. Harris to either return to the office or resign, *see* SMF ¶ 42, citing constantly shifting policy bases for this determination, *see* SMF ¶ 73 (relying on written FOP decision); SMF ¶ 77 (stating the policy is unwritten). And "shifting and inconsistent justifications are probative of pretext." *Ames v. Nielsen*, 286 F. Supp. 3d

70, 88 (D.D.C. 2017) (quoting *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011)). "[T]he use of unannounced policies, interpreted according to subjective criteria, *can* [also] support a plaintiff's claim of pretext." *McGee v. Stone & Webster Constr., Inc.*, 2008 WL 11422673, at \*11 (N.D. Ala. Feb. 29, 2008) (cleaned up). Based on this evidence, a reasonable jury could find that the "real reason" for the termination "was prohibited discrimination or retaliation" for the remote work request. *Allen*, 795 F.3d at 40.

In light of these genuine disputes of material fact, the Court denies summary judgment on the retaliation claims under the ADA, DCHRA, PPWFA, FMLA, and Title VII.

### E.    DCPWCL

Finally, Ms. Harris brings a DCPWCL claim for unpaid wages for her last week of employment. Opp'n 34. On this claim, the Defendants are entitled to judgment as a matter of law.

The DCPWCL provides, in relevant part, that "[a]n employer shall pay all wages earned to his or her employees on regular paydays." D.C. Code. § 32-1302. And "'[w]ages' means all monetary compensation after lawful deductions, owed by an employer, whether the amount owed is determined on a time, task, piece, commission, or other basis of calculation." *Id.* § 32-1301.

The undisputed record here shows that over a month after her termination, Ms. Harris emailed the Defendants stating: "I was never paid for the last week I worked in December, I could not check my overtime since my email was shut off, but I did at least my normal 40 hours, from 12/12 - 12/18." *See* Ex.52, ECF No.44-52. And the Defendants responded: "You can request your pay slip from Employee Connection at employee.connection@wbd.com for 12/12/22-12/18/22 to view what hours were paid. If there are any hours owed, you'll need to submit a manual timesheet with Raquel's approval of the hours worked." *Id.* Nothing in the record suggests that Ms. Harris

responded with such a time sheet. *See id.* Rather than log these hours, Ms. Harris brought this suit against the Defendants relying only on a declaration that she worked 40 hours. Opp'n 34.

Although such a declaration may be credited when an employer "improperly maintained their payroll records" leading to under-compensation, *see Ayala v. Tito Contractors, Inc.*, 82 F. Supp. 3d 279, 287 (D.D.C. 2015), Ms. Harris's claim that she worked 40 hours in this context is "a mere unsubstantiated allegation" that "creates no genuine issue of fact and will not withstand summary judgment," *LeBlanc*, 784 F. Supp. 3d at 18 (cleaned up). Ms. Harris is "an hourly employee." SMF ¶ 73. And company policy required her to log hours on a weekly basis so that the Defendants could pay her reasonable wages for her work. CNN SUMF ¶ 118. After failing to log hours consistent with this policy and again refusing to correct her hours when given the opportunity to do so later in March, Ms. Harris cannot now bring a lawsuit to collect unlogged wages. The lack of such hourly records is entirely her fault and not that of the Defendants. They cannot be "determined on a time, task, piece, commission, or other basis of calculation" as required by the statute. D.C. Code. § 32-1301.

Indeed, courts have come to similar conclusions when interpreting the federal Fair Labor Standards Act, which is usually "construed consistently" with the DCPWCL in light of their similar language and statutory scheme. *Ayala*, 82 F. Supp. 3d at 288. Under the FLSA, courts recognize that an employee cannot claim unpaid wages when an "employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the [alleged] work." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 (5th Cir. 2016) (citation omitted).

Because Ms. Harris "fail[ed] to notify" or possibly "deliberately prevent[ed]" the Defendants, *id.*, from making a "determination" or "calculation" of her hours worked, D.C. Code.

§ 32-1301, her claim for unpaid wages fails as a matter of law. The Court grants summary judgment to the Defendants on the DCPWCL claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Defendants' Motion for Summary Judgment, ECF No. 29. The Court grants summary judgment on the PWFA and DCWPCL claims and denies summary judgment on the ADA, FMLA, Title VII, DCHRA, and PPWFA claims.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date:   February 2, 2026